IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIDGETOWER OPCO, LLC d/b/a BEST COMPANIES GROUP, | : : : | Civil No. 1:21-CV-01869 |
| Plaintiff, | : : | |
| v. | : : | |
| MEGAN BURNS, | : : | |
| Defendant. | : | Judge Jennifer P. Wilson |

# MEMORANDUM

This case involves allegations of trade secret misappropriation brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and the Pennsylvania Trade Secrets Act, 12 Pa. Con. Stat. §§ 5301–5308 ("PUTSA"), with related state-law claims for breach of contract and conversion.  Plaintiff BridgeTower OpCo, LLC ("BridgeTower") d/b/a Best Companies Group ("BCG")[1] asserts that Defendant Megan Burns ("Burns") worked with her former supervisor at BridgeTower, Peter Burke ("Burke"), to steal and then use BridgeTower's trade secrets to open and operate a competing company, Workforce Research Group, LLC ("WRG"), in violation of state and federal law as well as Burns' non-compete and confidentiality agreement.

Presently before the court is Plaintiff's motion for temporary restraining order and/or preliminary injunction, which seeks to prohibit Burns from

---

[1] BCG is a subsidiary of BridgeTower and has no independent corporate existence.

1

"continuing to violate her agreement by working for WRG." (Doc. 4, pp. 1–2.)[2] The court notes that this is not a request to preserve the status quo, as Burns is already employed by WRG. Thus, this is a request for mandatory injunctive relief to force Burns to suspend her current employment during the pendency of this action. For the reasons that follow, Plaintiff's motion for preliminary injunction prohibiting Burns from continuing to work for WRG is denied.

## PROCEDURAL HISTORY

BridgeTower claims that Burke stole BCG's confidential trade secrets and materials to create his own competing business while he still worked for BridgeTower. (Doc. 1, ¶ 19.) BridgeTower also alleges that Burke then formed WRG, a competing business, and terminated his employment with BridgeTower. (*Id.* ¶¶ 19–20.) Prior to Burke leaving, BridgeTower asserts that he backed up all of the documents on his company laptop to a personal hard drive that contained almost all of BridgeTower's confidential documents, which he has been using in his new business. (*Id.* ¶ 22.)

Burns terminated her employment with BridgeTower and began working for WRG as well. (*Id.*, ¶ 29.) BridgeTower contends that: (1) WRG has begun offering nearly identical programs to those offered by BCG by copying and using

---

[2] Plaintiff's motion for temporary restraining order and/or preliminary injunction also requested relief on five other grounds. Burns consented to the entry of injunctive relief on these grounds. Accordingly, an order was entered on November 12, 2021. (Doc. 31.)

BCG's materials; (2) WRG has sent proposals to BCG's business partners that are almost indistinguishable from BCG's materials; (3) WRG has used or replicated many of BCG's proprietary templates, documents, and data to gain an unfair competitive advantage; (4) Burns had knowledge of this ongoing misappropriation; and (5) Burns has willingly participated in the use of BCG's documents for WRG. (*Id.* ¶¶ 24–26.)  BridgeTower further alleges that it assumed a non-compete and confidentiality agreement Burns signed with a predecessor company, Journal Multimedia, and that working for a competing business violates Burns' agreement. (*Id.* ¶¶ 11–13, 29–32.)

BridgeTower initiated this action by filing a complaint on November 2, 2021, alleging that Burns and Burke stole confidential information and trade secrets from BCG and were using that information at WRG to unlawfully compete with BCG in violation of Burns' non-compete and confidentiality agreement.[3] (Doc. 1, ¶¶ 1–2.)  BridgeTower then filed the instant motion for temporary restraining order and/or preliminary injunction along with a supporting brief on November 3, 2021.  (Docs. 4, 5.)  The certificate of concurrence filed with the motion indicated that Burns concurred in the motion as to the relief requested in

---

[3] BridgeTower filed suit against Burke, Burns, and WRG in the Southern District of Texas on September 15, 2021.  (Doc. 1, ¶ 33.)  Burns objected to venue being in Texas because of venue provisions in her non-compete agreement, so the parties agreed that she would be dismissed from the Texas action and that the instant action would be filed against her in this court.  (*Id.*)

3

subparts (a)-(d) and (f), but not subpart (e).  (Doc. 4-1.)  The relief requested in subpart (e) would prohibit Burns from "continuing to violate her agreement by working for WRG."  (Doc. 4, p. 2.)[4]

The court convened a telephone status conference with the parties on November 5, 2021 and confirmed with counsel for both parties that the only relief in dispute was the relief requested in subpart (e).  The court then issued a scheduling order setting an expedited briefing schedule and scheduling a hearing on subpart (e) of the motion.  (Doc. 15.)[5]  Burns filed a brief in opposition to the motion on November 9, 2021.  (Doc. 18.)  In her brief, Burns argued that BridgeTower was not likely to succeed on the merits because her non-compete agreement was not assumed by Transom (BridgeTower's current parent company) when it purchased BCG and, therefore, is not enforceable.  (*Id.* at 12–15.)  Further, she argued that BridgeTower failed to establish a legitimate business reason to enforce the non-compete agreement against her.  (*Id.* at 11–19.)  Lastly, she argued that BridgeTower cannot demonstrate a risk of immediate and irreparable harm, as

---

[4] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[5] Additionally, the court entered an order on November 5, 2021 granting a temporary restraining order as to subparts (a) through (d) and (f) by agreement of the parties.  (Doc. 16.)  The order went into effect immediately, but was set to expire on November 8, 2021 at 5:00 p.m. unless BridgeTower posted a bond in the amount of $100,000.00.  (Id., ¶ 6.)  No such bond was posted, and the order expired by its own terms on November 8, 2021 at 5:00 p.m.  The court entered a new order on November 12, 2021 granting a preliminary injunction as to subparts (a) through (d) and (f) by agreement of the parties and upon the posting of the bond.  (*See* Doc. 31.)

she does not have confidential information or trade secrets from BCG in her possession. (*Id.* at 16–19.)

BridgeTower filed a reply brief on November 10, 2021. (Doc. 20.) In its reply brief and during the hearing, BridgeTower argued that contrary to Burns' assertions, BridgeTower did assume Burns' non-compete agreement and that it was valid and enforceable. (*Id.* at 8–11.) BridgeTower further argued that a preliminary injunction is necessary because there is threatened misappropriation of trade secrets by Burns. (*Id.* at 11–16.)

## FACTUAL BACKGROUND

After briefing on the motion for temporary restraining order and/or preliminary injunction concluded, the court conducted a hearing on November 12, 2021, that was limited to the relief requested in subpart (e) of BridgeTower's motion, and received additional exhibits during the hearing. The court heard testimony from Adam Reinebach ("Reinebach"), the current CEO of BridgeTower, who testified about the various purchases of BCG since 2016, the confidential information BCG maintains, the steps it takes to protect this information, Burns' non-compete agreement, the purchase agreement from the last purchase of BCG in 2020, a series of spreadsheets Burke emailed Burns, and a series of emails between

Burns and a BCG co-worker.[6] Reinebach also testified that BCG has already suffered harm in the form of confusion in the marketplace, a loss of competitive advantage, and a loss of customer goodwill. Reinebach admitted, however, that other than the emails admitted into evidence at the hearing, he had no knowledge that any of BCG's confidential information was in Burns' possession. He also could not explain how Burns' employment at WRG contributed to the harms BCG has suffered other than to note his opinion that Burns' employment with WRG adds to the perception that BCG went out of business when WRG began operating.

Notably, as to the numerous purchases of BCG, Reinebach provided the following chronology. Burke created BCG. BCG was a part of Journal Multimedia Corporation. Burns' non-compete agreement is dated July 30, 2014, when BCG was a subsidiary of Journal Multimedia. (Pl. Ex. 1.) BridgeTower was a part of GateHouse Media in 2016. In May 2016, Gatehouse acquired Journal Multimedia and its assets, which included BCG. Reinebach testified that it was his "understanding" that GateHouse Media and/or BridgeTower assumed all of Journal Multimedia's employment contracts at that time. In 2019, Gannett became the new corporate owner of BridgeTower and, thus, BCG. Finally, in October 2020,

---

[6] Given the expedited nature of this case, a transcript of the hearing was not yet available at the time of this writing. Accordingly, information regarding the hearing is based on the court's own notes and recollection.

Transom Capital purchased BridgeTower and all of its assets, including BCG. A copy of the purchase agreement was admitted into evidence. (Pl. Ex. 2.)

Additionally, Reinebach testified about a series of spreadsheets that Burke sent to Burns via email after she asked if he had "any of the past KY winner lists" he could send her. (Pl. Ex. 4.) Reinebach stated that the spreadsheets contained some information available to the public (such as the winning companies for each year) and some information that was not available to the public (such as the contact information for each company and the companies that did not win). He also testified about an email exchange between Burns and Jackie Miller ("Miller"), an Operations Coordinator at BCG, while Burns still worked for BCG on June 24, 2021. (Pl. Ex. 5.) In response to Burns' request for "the KY list," Miller sent Burns the "KY Winner's List" from 2021, which was admitted with a redaction during the hearing. (*Id.* at 4–5.)

The court next heard testimony from Burns, who testified that she is working in a similar, but not identical role, at WRG. She testified about her job duties and the types of information she has access to and why she requested the Kentucky list from Miller and later from Burke. Burns specified that she does not work on customer business proposals or contracts for WRG to any extent. She also testified that other than the "KY Winner's List" spreadsheets that Burke sent her via email, she has nothing in her possession from her time working for BCG. Finally, she

7

confirmed that some of the information on the "KY Winner's List" spreadsheets was public information.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  In addition, this court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendant and Plaintiff asserts that the amount in controversy exceeds $75,000.  The court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367.  Further, venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction.  To obtain a preliminary injunction, plaintiffs must establish: (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction.  *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of*

*Del.*, 793 F.3d 304, 308 (3d Cir. 2015)). The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not consider the last two factors. *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If the plaintiffs do establish the first two factors, "[t]he court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179).

A party seeking mandatory injunctive relief that would alter, rather than preserve, the status quo, "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). To obtain a mandatory injunction, the party seeking a mandatory injunction must show that its right to relief is "indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Thus, a preliminary injunction

should only be awarded in the "limited circumstances" where "the movant, by a clear showing, carries the burden of persuasion." *Holland*, 895 F.3d at 285. Ultimately, the decision of whether to issue a preliminary injunction is left to the sound discretion of the district court. *Pennsylvania v. President of United States*, 930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

## DISCUSSION

### A. Likelihood of Success on the Merits

BridgeTower pursues two separate arguments as to why Burns should not be permitted to continue working at WRG while this action is pending. First, BridgeTower alleges that Burns' employment with WRG violates her non-compete and confidentiality agreement, which is valid and enforceable. (Doc. 20, pp. 8–11.) Alternatively, BridgeTower argues that a court can enjoin a defendant from beginning new employment if there is a threat of trade secret misappropriation, pursuant to the DTSA and the PUTSA. (*Id.* at 11–16.) The court is not persuaded that, based on the record before it, BridgeTower has not made an adequate showing of likelihood of success on the merits for either breach of contract or trade secret misappropriation to warrant the injunctive relief requested.

Regarding the allegations of a violation of Burns' non-compete agreement, Burns signed a document titled "Employee Non-Compete Agreement" on July 30, 2014. (Pl. Ex. 1.) At the time, BCG was owned by Journal Multimedia and

BridgeTower was part of GateHouse Media. (*Id.* at 2.) In May 2016, GateHouse acquired Journal Multimedia and its assets, including BCG. BridgeTower, and thus BCG, was purchased by Gannett in 2019, and finally by Transom Capital in October 2020. Reinebach testified that it was his "understanding" that, in the purchase in May of 2016, BridgeTower assumed all of Journal Multimedia's employment contracts and began managing BCG.

At the hearing, BridgeTower presented Reinebach's testimony and two documents in an effort to prove that Burns' non-compete agreement was assumed by BridgeTower and was therefore valid and enforceable. First, BridgeTower presented a copy of the agreement Burns signed with Journal Multimedia in 2014. (Pl. Ex. 1.) Next, BridgeTower presented the purchase agreement when Transom Capital purchased BridgeTower and BCG in October 2020. (Pl. Ex. 2.) The only evidence presented as to the prior acquisitions was Reinebach's testimony as to his "understanding" that the Journal Multimedia employment contracts were assigned along with the way with each successive acquisition. No assignment or purchase agreements were presented other than the 2020 purchase agreement, which does not expressly include Burns' non-compete agreement.

Therefore, while the purchase agreement presented does not exclude Burns' contract from the employment contracts that were assumed, it is unclear what the status of Burns' contract was *prior to* that purchase of BridgeTower by Transom

Capital.  Furthermore, while BridgeTower argues that Burns' contract contains successors and assigns language and the court should assume succession of the contract, the court notes that this language in Burns' contract merely advises the parties to the contract—Journal Multimedia and Burns—that the Company (in this case, Journal Multimedia) has "the right to assign its rights, duties and obligations hereunder to any direct or indirect subsidiary or Affiliate of the Company, or any successor in interest of the Company, whether by merger, consolidation, purchase/sale of assets or otherwise."  (Pl. Ex. 1., p. 2.)  This language clearly indicates that affirmative action was required by Journal Multimedia to assign its rights under the contract and no evidence was presented that such action took place.

    Moreover, there were two intervening purchases between the execution of the 2014 agreement and the 2020 purchase agreement.  There was no documentary evidence presented by BridgeTower that Journal Multimedia assigned the Burns contract to GateHouse Media or that GateHouse Media subsequently assigned the Burns agreement to Gannett.  The testimony about Reinebach's "understanding" that employee contracts were assigned with each successive acquisition (or at least in the 2016 acquisition) is not a sufficient evidentiary foundation upon which to base a finding that there is a valid and enforceable non-compete agreement between Burns and Bridgetower.   Therefore, based on the record before the court

at this juncture, BridgeTower has not demonstrated a likelihood of success on the merits as to the enforceability of the non-compete agreement between BridgeTower and Burns since it has not been established that Burns' agreement with Journal Multimedia was ever assigned to the various successor entities who employed Burns.

The court then turns to BridgeTower's argument regarding the misappropriation of trade secrets.  Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" when the owner of that information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  Under the PUTSA, a trade secret is defined as "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process" when that information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and  "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. Con. Stat. § 5302.  The DTSA and the PUTSA prohibit the misappropriation of trade secrets without consent.

The evidence presented at the hearing did not show that Burns even possessed any of BridgeTower's trade secrets much less that she misappropriated any trade secrets. BridgeTower heavily relied upon Burns' receipt of an email from Burke while she was employed by WRG after she asked Burke if he had "any of the past KY winner lists" that he could send her. (Pl. Ex. 4.) Reinebach testified that the spreadsheets that Burke sent to Burns contained some publicly available information and some information that was not available to the public.

For her part, Burns testified that she was simply asking for the publicly available list of winners that is published annually. Furthermore, the email stated that she could obtain the information from "the chamber" (the Kentucky Chamber of Commerce), but thought that Burke may have it. Burns also testified that she requested the information because WRG won the contract to provide services to Kentucky to compile the list for that year and they were re-doing the website. As a result, she requested the list because she was considering listing the winning companies from previous years on the new website, but ultimately decided against it, and did not use the spreadsheets Burke sent her at all. The documents Burke sent to Burns, in response to a request that could be construed as a request for publicly available information, were, in fact, BCG documents. However, the court is not concluding at this time that the spreadsheets contain trade secrets or that Burns' receipt of the spreadsheets constitutes a misappropriation of trade secrets

because the evidence presented thus far in this case is not sufficient to support that conclusion.

Beyond this single email with spreadsheets attached, which Burns testified that she never used, BridgeTower failed to introduce any evidence that Burns has access to or is in possession of any trade secrets or proprietary information belonging to BCG. In fact, the testimony presented at the hearing leads to the opposite conclusion. While working at BCG, Burns engaged in an email exchange with Jackie Miller, an Operations Coordinator at BCG. (Pl. Ex. 5.) In the emails, Burns asked Miller for "the KY list." (*Id.* at 2–3.) Miller sent Burns the "KY Winner's List" from 2021 as an attachment to an email. (*Id.* at 4–5.) This email exchange took place on June 24, 2021. (*Id.* at 2–3.) The email exchange with Burke in which Burns requests a copy of the Kentucky winner list took place on August 23, 2021, after Burns left BCG and was working for WRG. If, as BridgeTower asserts, Burns stole, retained, and misappropriated BCG's trade secrets and confidential, proprietary information (such as the "KY Winner's List" that Miller sent her in June, 2021), it is unclear why she would need to request this information from Burke.

Furthermore, under questioning by defense counsel, Reinebach admitted that he did not know whether Burns currently has access to any of BCG's confidential information; he did not know what Burns did, if anything, with the spreadsheets

Burke sent her; that an investigation into Burns' BridgeTower laptop revealed no evidence that she was sending any BCG information to herself or others; that he had no knowledge of anything improper in Burns' possession aside from the spreadsheet Burke emailed to her; and that he does not know what role Burns has at WRG or what job duties she may have there. Without showing that Burns is in possession of or has access to BridgeTower's trade secrets, BridgeTower has not met its burden of proving a likelihood of success on the merits as to a trade secrets misappropriation claim, as there cannot be a threat of misappropriation of documents one does not possess or at least have the ability to access.

BridgeTower has not, at this stage, demonstrated that it is likely to prevail on the merits of its breach of contract claim or its claim for misappropriation of trade secrets against Burns.

### B. Irreparable Injury

Although likelihood of success on the merits is a gateway factor that a plaintiff must establish, but has not in this case, the court will still address whether BridgeTower would suffer irreparable harm if preliminary injunctive relief were denied. *Holland*, 895 F.3d at 285–86. To demonstrate irreparable harm, BridgeTower "must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Further, because BridgeTower is

seeking mandatory injunctive relief, it "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC*, 528 F.2d at 179.  BridgeTower must demonstrate that its right to relief is "indisputably clear." *Hope*, 972 F.3d at 320 (3d Cir. 2020).

Here, BridgeTower has not demonstrated that it would suffer irreparable injury in the absence of preliminary injunctive relief.  When asked directly by the court what the immediate risk of harm was from Burns' continued employment with WRG, given that injunctive relief was granted as to subsections (a) through (d) and (f), BridgeTower responded that the irreparable harm at issue is the threatened misappropriation of trade secrets.  The case law cited by BridgeTower on this point only discusses enjoining *new* employment based on a threat of misappropriation of trade secrets or for the purpose of preventing an employee from working in the same capacity with the same customers.  *See Fres-co Sys. USA, Inc. v. Hawkins*, 690 Fed. App'x 72, 75–76 (3d Cir. 2017) (upholding an injunction where an employee was planning to begin work as a sales representative, the same position he occupied with the prior employer, and would be assigned to solicit former clients); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) (holding that a court has "discretion to enjoin a defendant from beginning new employment if the facts of the case demonstrate a substantial threat of trade secret misappropriation").

17

Here, BridgeTower is not requesting that the court enjoin Burns from beginning new employment in a similar field. Rather, BridgeTower is requesting that the court require Burns to suspend or terminate her existing employment at WRG. As discussed above, BridgeTower has not established that Burns is in possession of or has access to BCG's trade secrets. Furthermore, the testimony at the hearing did not demonstrate that Burns would be working in the same position with the same duties at WRG. In fact, Burns testified that she is starting at an entry-level position, as she did at BCG 17 years ago. She testified that she does not have access to pitches, proposals, or contracts, and that the only interactions she has with clients is when she is responding to inquiries made of her. She testified that she does not solicit customers or routinely communicate with clients.

Reinebach testified that WRG has already used BCG's confidential information, resulting in confusion in the marketplace and loss of goodwill and competitive advantage. However, he also testified that he had no specific knowledge of Burns playing a role in any of these alleged harms to BCG aside from her employment contributing to a perception that BCG no longer exists. Ultimately, BridgeTower may be able to establish these harms as a result of Burke creating and operating WRG, but BridgeTower has not, at this stage, proven that Burns' employment at WRG caused or is likely to cause these alleged harms to BCG.

Furthermore, injunctive relief was already granted that has the effect of prohibiting Burns from "using any documents or electronic files that contain or were derived from BridgeTower's confidential information or trade secrets" and prohibiting her from "unfairly competing with BridgeTower by soliciting any of BridgeTower's customers by using BridgeTower's confidential or trade secret information, or doing business with any of BridgeTower's customers who were solicited through the use of BridgeTower's confidential or trade secret information." (Docs. 16, 31.) Accordingly, the threat of misappropriation is adequately addressed by means of the relief already granted.

Because BridgeTower has not satisfied the first two factors necessary for the issuance of a preliminary injunction, the court will not examine the remaining factors. *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (holding that only if the movant establishes a likelihood of success on the merits and the existence of irreparable harm should "the district court consider the two remaining factors"). Based upon the current record, BridgeTower has not met its heavy burden of demonstrating entitlement to preliminary injunctive relief.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and/or preliminary injunction as to subheading (e)—prohibiting Burns from continuing to work for WRG—is denied. An appropriate order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: November 18th, 2021